UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DROR IRONI, DENNIS IRONI, and DAN IRONI, | ) ) ) | |
| Plaintiffs, | ) ) | No. 18 C 07989 |
| v. | ) ) | Judge Edmond E. Chang |
| EFI GLOBAL, INC. and, CL ACQUISITION HOLDINGS, LTD., | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Dror Ironi, Dennis Ironi, and Dan Ironi brought this action to rescind the 2015 sale of their environmental consulting business to EFI Global and CL Acquisition Holdings (EFI).[1] The Ironis base their claim for rescission on the theories of breach of contract, mutual mistake, equitable fraud, and unjust enrichment. R.1-1, Compl.[2] In response, EFI has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that the Ironis' claims are invalidated by the express language contained in the Purchase Agreement and Subscription Agreement attached to the Complaint. R. 12, Def.'s Br. Because the Court agrees that the Ironis'

---

[1]This Court has diversity jurisdiction over the case under 28 U.S.C. § 1332(a). The Ironis are citizens of California; CL Holdings was incorporated under the laws of the Cayman Islands, with its principal place of business in the Cayman Islands; and EFI was incorporated in Delaware, with its principal place of business in Texas. The amount in controversy plausibly exceeds $75,000.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

claims are foreclosed by the plain language in these contracts, the motion for judgment on the pleadings is granted.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In 2015, EFI Global (through its holding company CL Acquisition Holdings) acquired Andersen Environmental from brothers Dror, Dennis, and Dan Ironi. Compl. ¶¶ 16-17, 20. As consideration for the sale, the Ironis contracted to receive a $4.2 million cash payment, as well as 28,000 shares of restricted preferred stock in CL Holdings. *Id.* ¶¶ 22-23. This dispute arose three years later, when those 28,000 shares were redeemed at a much lower price than the per share valuation set out in the Andersen transaction documents. With the benefit of hindsight, the Ironis now argue that the original 2015 valuation was the product of either mistake or misrepresentation, and as a result, the entire transaction should be undone.

### A. The Purchase Agreement

In connection with the Andersen acquisition, the parties executed a Stock Purchase and Contribution Agreement (call it the Purchase Agreement for short). Compl., Exh. A.[3] Section 2.02 of the Purchase Agreement set out an aggregate purchase price of $7,000,000, while Section 2.02(b) specifically addressed the preferred shares of CL Holdings. *Id.* Under Section 2.02(b), "[t]he parties hereto agree that any CLAH Shares issued pursuant to this Agreement shall be issued (i) at an

---

[3]Documents attached to a complaint are considered part of the complaint for all purposes. Fed. R. Civ. P. 10(c).

agreed value per CLAH Share of $100.00 (the "**Agreed CLAH Share Value**")." *Id.* (emphasis in original). Although "agreed value" is not an explicitly defined term, Section 8.06 of the Purchase Agreement suggests that the agreed value is distinguishable from any sort of *actual* or market value, because that later section makes reference to "an agreed value per CLAH Share of $100.00 (regardless of the actual value of the CLAH Shares at the time of such transfer)." *Id.*

The Purchase Agreement also details the representations and warranties of both sides—Section 3 lists the representations and warranties of the Ironis, while Section 4 lays out the representations and warranties of EFI and CL Holdings. Compl., Exh. A. Finally, Section 10.06 of the Purchase Agreement also contains an integration clause, which says: "This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein … ." *Id.*

## B. The Subscription Agreement

In addition to the Purchase Agreement, the parties also executed a Subscription Agreement to specifically govern the issuance of the 28,000 restricted shares in CL Holdings. Compl., Exh. A. The Subscription Agreement is attached to the Purchase Agreement as its Exhibit A.[4] *Id.* Under Section 1 of the Subscription Agreement, the preferred stock was "issued … at a value of $100 per [share]." *Id.*

Like the Purchase Agreement, the Subscription Agreement also contains a series of representations and warranties from both sides. Under Section 3, for

---

[4]The Purchase Agreement and the Subscription Agreement are attached to the Complaint together as Exhibit A, so the Court will use the "Compl., Exh. A" citation for both.

instance, the Ironis (referred to as "Subscriber" in the agreement), make several representations and warranties. Some of the representations dealt with the Ironis' tolerance for the risk of investing in the preferred shares:

> (c) Subscriber is in a financial position to hold the Preference Shares for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of Subscriber's investment in the Preference Shares;
>
> (e) Subscriber has obtained Subscriber's own personal professional advice with respect to the tax consequences of, and the risks inherent in, the investment in the Preference Shares, and the suitability of an investment in the Preference Shares in light of Subscriber's financial condition and investment needs;
>
> (i) Subscriber realizes and acknowledges that (i) the acquisition of the Preference Shares is a long-term investment; (ii) Subscriber must bear the economic risk of investment in the Preference Shares for an indefinite period of time because the Preference Shares have not been registered under the Securities Act, or under the securities laws of any state or other jurisdiction and, therefore, none of such securities can be sold unless they are subsequently registered under said laws or exemptions from such registrations are available, and there can be no assurance that any such registration will be effected at any time in the future…(iv) the transferability of the Preference Shares is restricted…

Compl., Exh. A. Other representations described the Ironis' own financial background and their access to information about the preferred shares:

> (d) Subscriber has such knowledge and experience in financial and business matters that Subscriber is capable of evaluating the merits and risks of the prospective investment in the Preference Shares;
>
> (f) Subscriber believes that the investment in the Preference Shares is suitable for Subscriber based upon Subscriber's investment objectives and financial needs, and Subscriber has adequate means for providing for Subscriber's current financial needs and personal contingencies and has no need for liquidity of investment with respect to the Preference Shares;
>
> (g) Subscriber has been given access to full and complete information regarding the Company and has utilized such access to Subscriber's

4

> satisfaction for the purpose of obtaining the information Subscriber believes to be relevant in making his or her investment decision…
>
> (h) Subscriber acknowledges and agrees that he, along with his attorneys, accountants, tax advisors and other advisors, if any, has had an opportunity to fully evaluate an investment in the Preference Shares…

*Id*. The same section on representations and warranties also includes an acknowledgment by the Ironis that they did not rely on any "estimates, assumptions, and forecasts" provided by EFI, and that "no assurance is given or shall be given that actual results will correspond to the results contemplated by the various projections." *Id*. Similarly, the Ironis represented that the only representations and warranties made by EFI were those expressly listed in the Subscription Agreement. *Id*.

### C. Redemption of the Shares

Notwithstanding the language of the contracts, the Ironis allege that right before the Andersen acquisition in 2015, EFI "represented to Plaintiffs that the preferred stock in CL Holdings has a market value of $100 per share." Compl. ¶ 25. Based on this $100 per share valuation, the 28,000 preferred shares received by the Ironis should have been worth $2.8 million, resulting in a total purchase price of $7 million for the Andersen acquisition. *Id*. ¶ 28. EFI also allegedly "represented" that these "shares would increase in value throughout the acquisitions cycle and afterward," and that "outside venture capital partners would invest $200 million into CL Holdings to grow its operations through acquisitions, thereby further increasing the value of its preferred stock." *Id*. ¶¶ 26-27.

But when the Ironis finally redeemed their preferred stock in 2018, the per share valuation had dropped to $26 per share—nowhere near the $100 per share that

5

they had allegedly been promised three years earlier. Compl. ¶¶ 33-35. This was strange, according to the Ironis, because EFI's "earnings" were higher in 2018 than in 2015, and there was no other "market event or occurrence within CL Holdings or EFI" that could "account for a three-fold decrease in the market value of CL Holdings preferred stock." *Id.* ¶¶ 36-39. The Ironis now allege that the "only plausible explanation" for the discrepancy in valuations is that EFI "misrepresented the value of its preferred stock at the time of the Andersen acquisition and that, in reality, the stock was, at that time, not even worth $26 per share." *Id.* ¶ 40.

## II. Standard of Review

A party may move for judgment on the pleadings after the pleadings are closed. Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). In deciding a motion for judgment on the pleadings, the Court must accept all well-pled allegations as true and view the alleged facts in the light most favorable to the non-moving party. *Id.* Judgment is proper if the non-movant fails to state a claim for relief based on the pleadings. *Id.* In evaluating this type of motion, the Court considers just the pleadings alone, which consist of the complaint, the answer, and any documents attached as exhibits. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

## III. Analysis

### A. Breach of Contract and Mutual Mistake

The Ironis allege that they are entitled to rescission of the Purchase Agreement for two separate reasons. First, EFI allegedly breached the contract by paying less than the $7 million purchase price. Compl. ¶¶ 42-45. Alternatively, the parties were mutually mistaken as to the "value" of the CLAH shares at the time of the acquisition. *Id.* ¶ 48. EFI argues that under the explicit terms of the governing agreements, there was neither a breach of contract nor a mutual mistake, and even if there were, the Ironis are not entitled to the remedy of rescission. The Court agrees with EFI.

#### 1. Breach of Contract

The Ironis' theory for breach of contract goes like this: the $7 million purchase price, which was comprised of a $4.2 million cash payment and 28,000 preferred shares of CL Holdings, could only be satisfied if the 28,000 preferred shares were each worth $100 per share (resulting in an aggregate equity value of $2.8 million). Compl. ¶¶ 42-43. But because the CL Holdings shares were actually worth *less* than $100 per share at the time of the acquisition—evidenced by the fact that the 2018 shares were only valued at $26 per share despite higher earnings in 2018 than 2015—the full $7 million value was not paid. *Id.* ¶ 44. Thus, EFI allegedly breached a material element of the Purchase Agreement. *Id.* ¶ 45.

Under Delaware contract law, "it is presumed that the language of a contract governs when no ambiguity exists. Under the objective theory, intent does not invite a tour through the plaintiff's cranium, with the plaintiff as the guide. This

presumption that parties will be bound by the language of the contracts they negotiate holds even greater force when the parties are sophisticated entities that bargained at arm's length. More specifically, Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations." *Progressive Int'l. Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at \*7 (Del. Ch. July 9, 2002) (cleaned up).[5]

Here, when the Ironis allege that the "value of CH Holdings preferred stock at the time of the Andersen acquisition was less than $100," what they really mean to say is that the *market* value, not the agreed value, was less than $100. Compl. ¶ 43. Indeed, they make numerous references to "market value" throughout their Complaint. But that term does not appear anywhere in the actual contract, and that absence matters because of the integration clause in Section 10.06 of the Purchase Agreement. Compl., Exh. A. Section 10.06 says that the written contract comprises the entirety of the parties' agreement. So there is no objectively expressed text in the agreement to support that the parties ever intended for "agreed value" to be the equivalent of "market value." Quite the opposite—Section 8.06 of the Purchase Agreement clearly distinguishes between "agreed value" and "actual value" (whatever "actual value" might mean in the context of restricted stock). *Id.*

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Specifically, when discussing paying the Ironis with preferred shares if an indemnification obligation is triggered, Section 8.06 says that the shares "shall be valued at an *agreed value* per CLAH Share of $100.00 (regardless of the *actual value* of the CLAH Shares at the time of such transfer)." *Id.* (emphases added). So "agreed value" and "actual value" are two different things. And it is the term "agreed value" which appears in Section 2.02 of the Purchase Agreement. *Id.* Under this agreed $100 per share valuation, the 28,000 shares promised to the Ironis were "worth" $2.8 million. That is exactly what the Ironis agreed on and received, so EFI did not breach the purchase price element of the Purchase Agreement.

## 2. Mutual Mistake

In an alternative to the breach of contract claim, the Ironis argue that the sale should be rescinded on the basis of mutual mistake as to the "value" of the preferred shares. Compl. ¶ 48. But again, this theory, too, relies on a conflation of agreed value and market value that is not supported by the contract language itself.

Under Delaware law, a contract can be rescinded on the basis of mutual mistake if (a) both parties were mistaken as to a basic assumption; (b) the mistake materially affects the agreed-upon exchange of performances; and (c) the party adversely affected did not assume the risk of the mistake. *Progressive*, 2002 WL 1558382, at *6 n.26. Delaware courts recognize three scenarios in which "a party is said to have assumed the risk of a mistake: (a) the contract expressly assigns the risk to that party; (b) the mistaken party undertook to perform under a contract aware that his knowledge was limited with respect to the facts to which the mistake relates;

9

or (c) the court finds that it is reasonable to assign the risk to the party seeking rescission." *American Bottling Co. v. Crescent/Mach I Partners, L.P.*, 2009 WL 3290729, at *3 (Del. Super. Ct. Sept. 30, 2009).

According to the Ironis, "[a]ll parties to the Agreement were mistaken as to the value of shares of CL Holdings preferred stock." Compl. ¶ 48. Again, when the Ironis say "value," they are referring to market value, not what the contract set as the agreed value of the shares. But there is nothing to suggest that the "market value" of the preferred shares was a basic assumption (or even an assumption at all) of either the Purchase Agreement or the Subscription Agreement. For instance, as explained earlier, it is clear from the language in Section 8.06 of the Purchase Agreement that the "agreed value" was distinct from any "actual value" that the shares may have had. Compl., Exh. A. And other than this one mention of "actual value" in the Purchase Agreement, the terms "actual value" and "market value" do *not* appear anywhere else in the two contracts. Instead, the parties chose to use the term "agreed value." *Id.*

Notwithstanding the plain language of the agreements, the Ironis rely on what they say are the "basic canons of contract construction" to contend that the "only logical reading of the Stock Acquisition Agreement is that the $100 share valuation reflected the parties' understanding of the market value of the stock." R.17, Pl.'s Resp. Br. at 6. Why else, the Ironis ask, would they "agree to a $100 per share valuation if they actually believed that the stock had a market value less than $100?" *Id.*

That's a good question, and it is not clear why the Ironis decided to enter into contracts that provided for an *agreed* valuation rather than an actual "market value" of the shares. One thing is clear on the pleadings: mutual mistake was *not* the reason why. At the time of the transaction, the *Ironis* took on the risk of not knowing exactly what they would receive when the shares were later redeemed—they undoubtedly hoped to receive more than $100 per share, but the contracts make clear that they were also prepared to receive much less. Indeed, the Ironis are now essentially seeking a retroactive guarantee of the *cash* equivalent of the purchase price, which is most certainly *not* what EFI promised them. To the contrary, it was the Ironis who represented that they were sophisticated investors with "such knowledge and experience in financial and business matters that [they were] capable of evaluating the merits and risks of the prospective investment." Compl., Exh. A. In Section 3 of the Subscription Agreement, the Ironis also represented that they were aware that the shares were restricted and thus unmarketable at the time of the acquisition. *Id*. Nonetheless, they consulted with their "attorneys, accountants, tax advisors and other advisors" and took advantage of "full and complete information … in making [their] investment decision." *Id*. What is more, the Ironis acknowledged the "risks inherent in" their decision to invest in restricted stock, as well as the possibility that their investment would result in a "complete loss." *Id*.

Given all this, even if "market value" were somehow a basic assumption of the contract, the Ironis clearly assumed the risk of mistake—they bore the financial burden if the shares turned out to be worth nothing, and they agreed to accept

11

restricted stock despite knowing that true "market value" would not be ascertainable for quite some time. The contracts do not allow for an interpretation that there was any mutual mistake in the agreed valuation of the preferred shares. Rather, the Ironis knew that this was a risky investment that could potentially result in "complete loss," yet they chose to accept the 28,000 shares anyway. (They do not allege any defects with either the diligence process or the contract-negotiation process itself.) They could very well have chosen an alternative consideration structure—like all cash—that would have done a better job of guaranteeing them the $7 million they hoped to earn from the sale. Instead, the Ironis chose to accept a fixed number of restricted shares that they knew would not be marketable for quite some time precisely because of the potential upside of that uncertainty. At most, they made a poor prediction, not a mistake. *See Interim Healthcare, Inc. v. Sherion Corp.*, 2003 WL 22902879, at *7 n.33 (Del. Ch. Nov. 19, 2003) ("A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a mistake as that word is defined.") (cleaned up). The Ironis have failed to state a claim for rescission on the basis of mutual mistake.[6]

### B. Equitable Fraud

The Ironis next attempt to assert a claim for equitable fraud. To state a claim for equitable fraud under Delaware law, a plaintiff must allege: (a) a misrepresentation; (b) an intent that the claimant will act (or not act) as a result of

---

[6] Even if the Ironis had stated a valid breach of contract or mutual-mistake claim, it is far from clear that rescission would be a proper remedy. In any event, there is no need for the Court to decide that issue.

the misrepresentation; (c) justifiable reliance by the claimant; and (d) injury. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1993). Unlike common law fraud, equitable fraud does not require "that the respondent acted knowingly or recklessly—innocent or negligent misrepresentations or omissions suffice." *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014). In exchange for the relaxed scienter requirement, equitable fraud is only available in special circumstances, specifically, where there is either "a special relationship between the parties or other special equities, such as some form of fiduciary relationship," or "a justification for a remedy that only equity can afford." *Zebroski*, 2014 WL 2156984 at *7.

The parties dispute whether those special circumstances have been adequately alleged in this case (the Ironis argue that because they are seeking the equitable remedy of rescission, that should be enough, Pl.'s Resp. Br. at 12), but there is no need to reach that question because the Ironis have failed to satisfy the threshold requirement for a fraud claim—a misrepresentation. Here, the Ironis allege that EFI "falsely represented the value of its preferred shares at the time of the Andersen Purchase Contract as $100 per share," which was "intended to induce and did induce" the Ironis to go through with the sale. Compl. ¶¶ 62-63. The Ironis acknowledge that "both the Stock Purchase Agreement and the Subscription Agreement contain disclaimers limiting Defendants' representations to those in the two agreements." Pl.'s Resp. Br. at 13. Nonetheless, they point to "the simple fact" that Section 2.02 of the "Purchase Agreement itself contains a representation that the stock was worth $100 per share." *Id.*

13

This is an untenable reading of the Purchase Agreement. Nowhere in Section 2.02 (or anywhere else in the Purchase Agreement) does EFI ever *represent* that the value of the preferred stock is $100 per share. Instead, the valuation is referred to as "an agreed value per CLAH Share of $100.00 (the "**Agreed CLAH Share Value**")." Compl., Ex. A (emphasis in original). This provision simply lays out the *agreement* of both parties, not any *representation* of either party to the other.

The Ironis try to overcome this obstacle by arguing that the Section 2.02 "representation came straight from Defendants." Pl.'s Resp. Br. at 13. But again, nowhere in the four corners of the contract is this "agreed value" of $100 per share described as some kind of *representation* made by EFI. Section 2.02 itself does not attribute the statement to either party. Compl., Exh. A. Article 4 of the Purchase Agreement lists the representations and warranties of EFI and CL Holdings. *Id.* There is no representation or warranty about the valuation of the shares. *Id.* The same is true for Section 4 of the Subscription Agreement. *Id.* In fact, in Section 3(m) of the same agreement, the Ironis expressly acknowledge that the representations and warranties contained in the documents are the *only* representations and warranties from the Defendants, and they disclaim reliance on any other "cost estimates, projections and predictions." *Id.*

The Ironis' suggest that EFI is "free to contest" and "entitled to take discovery on the issue" of whether they are the "source" of the Section 2.02 valuation provision. Pl.'s Resp Br. at 13. But this is precisely the kind of touring-through-craniums exercise that the existence of a written contract forecloses. Whether EFI was the

"source" of the $100 per share figure or not simply does not matter. The parties deliberately agreed to present the per share number as an "agreed value," not as a representation or warranty by EFI to the Ironis. The claim for equitable fraud fails.

### C. Unjust Enrichment

Finally, the Ironis bring a claim for unjust enrichment based on the same general theory as already discussed, that is, because the preferred shares were not actually worth $100 per share, EFI underpaid the Ironis for Andersen, and thus EFI has been unjustly enriched. Compl. ¶ 67-68. This claim also must fail.

Under Delaware law, unjust enrichment is "a theory of recovery to remedy the absence of a formal contract. Therefore, claims of unjust enrichment may survive a motion to dismiss when the validity of the contract is in doubt or uncertain. When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed." *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (cleaned up). The Ironis appear to acknowledge that the existence of a contract bars an unjust enrichment claim, but they argue that because they are seeking rescission of the contract, "i.e., that the Agreement be treated as though it never existed," then "there is no impediment to a claim of unjust enrichment." Pl.'s Resp. Br. at 14. But, as discussed earlier in this Opinion, the Ironis have failed to allege any valid basis for rescission (breach of contract, mutual mistake, or equitable fraud), and as a result, they are not entitled to the remedy. Thus, a valid contract exists and clearly controls

the parties' relationship, which means there is no room for an unjust enrichment claim.

## IV. Conclusion

EFI's motion for judgment on the pleadings is granted, and all three claims are dismissed with prejudice. The Ironis did not ask for a chance to replead, and in any event, the claims do not appear to be fixable via amended allegations given the clear contractual language at issue in this case. (But the Ironis may move to reconsider this if they believe that there is a way to salvage the claims.) Final judgment shall be entered. The status hearing set for October 3, 2019 is vacated.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2019